**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 12-cv-03358-CMA-BNB

C.S., an unemancipated person, through his parents and next friends,
Michael and Cynthia Schaffer,

      Plaintiff,

v.

PLATTE CANYON SCHOOL DISTRICT NO.1,
MIKE SCHMIDT, Individually, and
MEGGIN STOUT, Individually,

      Defendants.

---

**ORDER ON DENYING MOTION TO DISMISS AND GRANTING IN PART AND
DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

---

      C.S.,[1] a developmentally disabled former student at Platte Canyon High School,

alleges, his teacher, Meggin Stout, engaged in a year-long campaign of abuse that

was effectively abetted by his principal, Mike Schmidt, and the school district itself.

He concludes that this conduct gives rise to a number of claims under the Constitution,

federal statutes, and state tort law.  Defendants—Ms. Stout, Mr. Schmidt, and the

school district—all disagree, arguing that, because C.S. failed to pursue these claims

through an administrative process, he is now precluded from bringing this suit.  In the

alternative, they argue that this Court can decide many of the claims in their favor as

a matter of law.

---

[1]  Following the convention adopted by the parties, this Court refers to C.S. by his initials.

This Court concludes that Defendants are estopped from asserting the defense of Plaintiffs' failure to exhaust administrative remedies.  At the same time, the Court concludes that all of Plaintiff's constitutional and federal claims fail as a matter of law.  Having disposed of all the federal claims, this Court does not exercise pendant jurisdiction over the state-law claims that remain.

## I.  BACKGROUND

C.S. has cerebral palsy and functions in the extremely low range of measured intelligence.  He needs the assistance of a walker, has difficulty expressing himself, and communicates primarily by pointing and approximated vocalizations.  Further, although disputed, C.S. alleges he was a relatively well-behaved student at the beginning of the 2010 school year with no disciplinary problems serious enough to document in written behavioral assessments.[2]  C.S.'s impairments qualified him as a "child with a disability" within the meaning of the Individuals with Disabilities Education Act (IDEA).  This means C.S. had an Individualized Education Program (IEP) under the IDEA.

Ms. Stout was C.S.'s teacher during the 2010-2011 academic year—the time period relevant here.  She was assisted during this time by three paraprofessionals,

---

[2]  C.S.'s classroom comportment in the 2010-2011 academic year is a matter of dispute between the parties.  C.S. emphasizes a March 2010 report that states he did not exhibit conduct that required a behavior intervention plan, which C.S. takes to mean that there was no need for any sort of corrective behavior during class.  (Doc. # 49, ¶ 19.)  Defendants disagree that the absence of such a plan means that C.S. was not disruptive.  They also point to a March 2010 record indicating that C.S. had problems in the past with large or loud groups, that he could become disruptive in such groups, and that his biggest accomplishment is sitting through class without causing disruptions.  (Doc. # 44-2 at 6.)  Nevertheless, the same authority Defendants cite notes that C.S. "is now able to attend to full 90-minute classes without disrupting the teacher." (Id.)  Neither authority is dispositive as to C.S.'s classroom behavior: his prior troubles (especially in a large assembly) say nothing about how he did in a smaller classroom, just as the absence of a behavior plan is not conclusive proof that he was never disruptive and/or (un)justifiably disciplined.  Thus, for purposes of this motion, the Court must construe these disputed facts in favor of C.S.

who worked with C.S. and Ms. Stout during the school year and all have extensive experience (if not expertise) in special education.

## A.      C.S.'S ALLEGATIONS ABOUT MS. STOUT

C.S. levels serious charges of abuse against Ms. Stout, which he supports in large part through the testimony of the paraprofessionals, all of whom wrote lengthy letters to school administrators alleging that her behavior with C.S. was inappropriate and disturbing.[3]  *See* (Doc. ## 49-2, 49-3, 49-4, 49-5.)

In essence, the paraprofessionals and C.S. fault Ms. Stout for four types of behavior.  First, they allege Ms. Stout converted a technique normally used to assist C.S. with transitioning from sitting to standing into a means of bullying and demeaning him.  The technique involves using a series of prompts to help C.S. stand up.  The last of these prompts is the main one at issue here.  As it is described by an expert witness relied upon by C.S., this technique requires "slowly tilting [C.S.'s] chair forward in a manner that [would] raise[] and move[] [C.S.'s] center of gravity forward over his feet" so he could stand.  (Doc. # 44-11 at 2.)

---

[3]  The three paraprofessionals all employ slightly different language to describe Ms. Stout's conduct.  *See, e.g.*, (Doc. # 49-8 at 30) (deposition of Cynthia Urie, who described Ms. Stout's conduct as "outrageous").  The parties spend much time parsing the meanings of the terms paraprofessionals used to describe Ms. Stout's behavior.  This Court will not engage in the same exercise, as it seems generally undisputed that the paraprofessionals thought Ms. Stout's actions were disturbing to them.  Any further amplification of this language is immaterial for purposes of deciding the instant motion.

Importantly, the parties **do not** dispute that the tilting technique—which C.S. calls "dumping"[4]—**can** be an appropriate means of helping C.S. to stand.  The parties **do** dispute how Ms. Stout employed this technique and toward what end.  In particular, C.S. alleges that rather than slowly tilting C.S.'s chair **after** attempting other methods of getting C.S. to stand, Ms. Stout would quickly resort to tilting, do it very abruptly, do it with the goal of making C.S. fall, or simply pull C.S.'s chair out from under him on pretext of doing the tilting.  C.S. alleges that when Ms. Stout did the tilting, he would often fall on his knees.  Sometimes after he fell, Ms. Stout would make him crawl to his walker and demean him by calling him a baby in front of the rest of the class.  *See, e.g.*, (Doc. # 44 at ¶¶ 9-10; 49-13 at 4, 49-7 at 14.)  Finally, Defendants concede that for purposes of this motion, Ms. Stout "dumped C.S. out of his chair because she became frustrated and lost her patience with C.S. and because she did not like him."  (Doc. ## 49 at Add'l Fact, ¶ 13; 52 at 4.)

Second, C.S. alleges Ms. Stout punished him by isolating him from the rest of the class.  In particular, C.S. alleges she forced him into the hall for long periods of time or forced him to face the wall in a corner of a classroom and then placed a cabinet in front of him.  C.S. often remained in the desk behind the cabinet for an hour or more—sometimes multiple times a day—and the punishment occasionally extended from one day to the next.  (Doc. # 49 at Add'l Facts, ¶¶ 17-19.)

---

[4] There is a great deal of dispute about what to call this technique.  *See, e.g.*, (Doc. # 44, ¶ 27) (Defendants' motion for summary judgment noting that the paraprofessionals called the technique "dumping" but refusing to concede that this is the proper terminology).  The Court opts for the "tilting technique."

Third, C.S. alleges that on at least one occasion, when Ms. Stout did not like the response she received from him, she took her hand to the back of his head and pushed it with force into his desk.  She then held C.S.'s head in this position for one to two minutes while reprimanding him.  (Doc. # 49 at Add'l Facts, ¶ 21.)

Fourth, C.S. alleges Ms. Stout's attitude toward C.S. was generally laced with ill-will.  For example, C.S. alleges Ms. Stout: targeted C.S. without provocation when she was frustrated, (Doc. # 49-8 at 16); called him gross, (Doc. # 44, ¶ 12); forced him to do tasks he could not quickly complete and then ridiculed him for failure (Doc. # 44, ¶ 9); and mocked him for smelling bad, (Doc. # 44, ¶ 13).

Ms. Stout offers explanations for many of the above actions: she claims that her tilting technique conformed to the practices even C.S. admits would be appropriate, that the paraprofessionals are both liars and insufficiently expert in her field to know about the techniques she employed, and that her use of these techniques was motivated not by frustrated caprice but by a genuine need to correct C.S.'s behavior.  These explanations might be important at trial but are not relevant for purposes of the present motion, and the Court takes as true the thrust of C.S.'s allegations outlined above.

## B.   PLATTE CANYON'S RESPONSE TO C.S.'S COMPLAINTS

There is no evidence in the record that C.S., through his parents, Cynthia and Michael Schaffer, brought Ms. Stout's behavior to the attention of supervisors until after all of the incidents giving rise to this complaint had occurred.  The first meeting between the parties about Ms. Stout's behavior occurred in August 2011 when C.S.'s parents met with Michael Schmidt, the principal of Platte Canyon, and a defendant in this action.  At this meeting, one potential avenue to addressing the Schaffers' concerns about

Ms. Stout was to modify C.S.'s IEP to explicitly limit the types of actions Ms. Stout could take with C.S.  *Cf. Muskrat v. Deer Creek Pub. Sch.*, 715 F.3d 775, 781 (10th Cir. 2013) (noting that parents of a student subjected to allegedly excessive timeouts had their son's IEP amended to state that staff would not place the child in a timeout room).

The Shaffers did not pursue this option, however, because Mr. Schmidt told them "an IEP meeting is not the appropriate forum for complaints regarding . . . Ms. Stout," and that instead they should use "a formal district policy regarding filing complaints against employees."  (Doc. # 34-8 at 2)  That complaint policy is referred to by both parties as Platte Canyon School District (PCSD) Policy 703.  (*Id.*)

On September 13, 2011, Cynthia Schaffer filed a complaint pursuant to PCSD 703, detailing essentially the same complaints about Ms. Stout that the Court has outlined above.  Two of the paraprofessionals submitted letters with Ms. Schaffer's complaint.  (Doc. # 49-16.)

The school district responded to the complaint about a month later, on October 18, 2011.  In the response, Superintendent James Walpole, Ph. D., relying on an investigation conducted by Mr. Schmidt, found no evidence of wrongdoing on Ms. Stout's part.  He stated that the tilting technique and the use of timeouts were "standard practice" in PCSD, even though they might be viewed as harsh by those not familiar with them.  Ms. Schaffer then requested a hearing with the PCSD Board of Education to appeal Dr. Walpole's dismissal of her complaint against Ms. Stout.  She submitted additional letters from the paraprofessionals reacting to Dr. Walpole's letter. The board, however, refused to hear the appeal.  (Doc. ## 49, ¶¶ 29-33; 49-17.)

C.S. alleges that as a result of Ms. Stout's actions, he suffers from post-traumatic stress disorder but from no physical injuries.  (Doc. # 49, ¶ 31).  In December 2012, C.S. filed the instant lawsuit, alleging that Ms. Stout's behavior and the district's response give rise to a number of violations of the law, which the Court considers in turn below.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate if the moving party demonstrates there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998).

## III.  <u>ANALYSIS</u>

### A.    IDEA EXHAUSTION

Before assessing the merits of any of C.S.'s claims, this Court must determine whether it has jurisdiction over them.  As Defendants note, C.S.'s parents had the ability to initiate an administrative hearing under the IDEA to challenge "any matter relating to . . . the provision of a free appropriate public education."  20 U.S.C. § 1415(b)(6), (f). A parent who is not satisfied with the result of the administrative hearing may then file suit in state or federal court.  *See* 20 U.S.C. § 1415(f), (i).

Further, as Defendants note, while a claim under the IDEA is not the exclusive remedy to address Ms. Stout's actions, the IDEA mandates that "before the filing of a civil action under such laws seeking **relief that is also available under this subchapter**, the [IDEA administrative hearing] procedures . . . **shall be exhausted**

to the same extent as would be required had the action been brought under this

subchapter." 20 U.S.C. § 1415(*l*) (emphasis added).  In interpreting the meaning of

"also available under this subchapter," the Tenth Circuit has instructed that the

"dispositive question generally is whether the C.S. has alleged injuries that could be

redressed *to any degree* by the IDEA's administrative procedures and remedies."

*Cudjoe v. Indep. Sch. Dist. No. 12*, 297 F.3d 1058, 1066 (10th Cir. 2002) (emphasis

in original).

Relying on the Tenth Circuit's "to any degree" language, Defendants conclude

that because **some** of the Schaffers' complaints about Ms. Stout could have been

addressed to some degree by a modification to C.S.'s IEP, all of their claims fail for

failure to pursue and exhaust the IDEA administrative procedures.

Defendants might have more of an argument here if Mr. Schmidt had not

represented to the Schaffers, as noted above, that "an IEP meeting is not the appropriate

forum for complaints regarding . . . Ms. Stout."  (Doc. # 34-8 at 2.)  This representation

estops Defendants from asserting the failure to exhaust defense.  Defendants cannot

invoke exhaustion when they thwarted exhaustion.[5]  Mr. Schmidt may have been

mistaken to turn the Schaffers away from the administrative procedures created by the

IDEA, but that mistake cannot be held against C.S.  Rather, when Mr. Schmidt said an

---

[5]  *Accord Quackenbush v. Johnson City Sch. Dist.*, 716 F.2d 141, 148 (2d Cir. 1983)
(addressing an IDEA case where a parent "[o]n instructions" of the Defendant failed to complete
a form necessary to pursue an IDEA and holding that rather than dismissing for failure to
exhaust "the better solution is to allow § 1983 to supply the right of action to a C.S. who has
been denied procedural safeguards under [20 U.S.C.] § 1415"); *see also Manecke v. Sch. Bd.
of Pinellas Cnty., Fla.*, 762 F.2d 912, 919 (11th Cir. 1985) (similar).

IDEA remedy would be inappropriate, he made "relief that is also available under" the IDEA effectively unavailable to C.S.

Magistrate Judge Boland reached essentially the same conclusion in his Report and Recommendation on this matter.  (Doc. # 60 at 12.)  The Court agrees with Judge Boland's position, notwithstanding Defendants' objection.  Accordingly, the exhaustion requirement of § 1415(*l*) is inapplicable and this Court affirms Judge Boland's recommendation.[6]

## B.    CONSTITUTIONAL AND FEDERAL CLAIMS

Having determined that this Court has jurisdiction over this case, this Court first considers Plaintiff's constitutional claims raised under 42 U.S.C. § 1983.  Defendants mount a typical two-pronged defense to these claims, alleging that: (1) they did not violate C.S.'s constitutional rights and, (2) in any event, their conduct did not violate any

---

[6]  Defendants also point to *Cherry v. Clark County School District*, 2013 WL 3944285 (D. Nev. July 22, 2013), another IDEA case about alleged abuse of a special-needs child.  In *Cherry*, plaintiffs began pursuing the IDEA administrative procedures but then "withdrew their request," while "**specifically reserv[ing]** their right to re-file" their IDEA administrative complaint.  *Id.* at *7 (emphasis added).  The *Cherry* plaintiffs then entered informal negotiations with the school district in question, were unsatisfied with the result of the negotiation, and filed a federal suit without re-filing their IDEA complaint.  *Id.*  Defendants rely on a later order in *Cherry*, which considered those plaintiffs' argument that they satisfied IDEA exhaustion through the informal negotiation.  The *Cherry* court rejected this argument, reasoning that it "confused informal *resolution* with *exhaustion*" of an IDEA claim.  *Cherry*, 2013 WL 5492625, at *2 (D. Nev. Sept. 30, 2013) (emphasis in original).  Defendants appear to argue that Mr. Schmidt's statement about an IEP proceeding not being an "appropriate forum for complaints" regarding Ms. Stout is comparable to an offer at informal resolution.  The comparison falls apart, however, because the *Cherry* plaintiffs were on fair notice that they could continue to pursue their administrative claim, while C.S. was specifically told by Defendants he could not even initiate such a proceeding.  Thus, *Cherry* is of no aid to Defendants.  Finally, the parties extensively debate the question of whether IDEA exhaustion constitutes a jurisdictional or non-jurisdictional rule.  But this debate is of no consequence for present purposes: Mr. Schmit's representation undermines the exhaustion defense, regardless of the (non-)jurisdictional nature of the rule.  *Cf. Muskrat*, 715 F.3d at 785 (similarly declining to reach this question as it was not outcome determinative).

constitutional rule that was clearly established at the time of the events in question.

*See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (reiterating this framework).

As is explained below, the second prong of this test is the dispositive one for at least one of C.S.'s constitutional claims. On this second prong, the Supreme Court recently instructed:

> a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate. In addition, we have repeatedly told courts . . . not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.

*Plumhoff*, 134 S. Ct. at 2023 (quoting and citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2074, 2083-84 (2011) (internal quotation marks omitted; alterations incorporated);

*see also Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir.1992) (noting that in the Tenth Circuit, "[o]rdinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the [the plaintiff] maintains").

Applying the above framework, this Court considers first the individual constitutional claims against Ms. Stout before considering the claims of supervisory and entity liability.

1.  Fourth Amendment Claim—Ms. Stout

First, C.S. alleges that Ms. Stout violated the Fourth Amendment's prohibition on unreasonable seizures through the following actions: (1) punishing C.S. by isolating him

in a corner behind classroom furniture; (2) frequently placing C.S. in the hall; (3) pinning C.S.'s head to his desk with her hand for one to two minutes while verbally reprimanding him.

Again, Defendants strenuously deny that (1) and (2) were acts taken to arbitrarily **punish** C.S.  Defendants argue these actions were essentially part of C.S.'s education or were a necessary means of allowing C.S. to decompress.  They also deny that (3) even occurred.

All three of these defenses here, however, derive from genuinely disputed facts. The paraprofessionals emphasize the essentially arbitrary and punitive dimension to both forms of isolation from class and have testified under oath that the head-pinning incident occurred.  Thus, for present purposes, the Court must accept C.S.'s view of these facts, even if that might not be accepted by a fact-finder at trial.

     *a)*    *Standard*

Tenth Circuit precedent provides a murky answer to the question of how the Fourth Amendment applies in the school discipline context.  As an initial matter, it is well established ground that the Fourth Amendment's protections at least apply to **searches** conducted by school officials.  *See, e.g.*, *New Jersey v. T.L.O.*, 469 U.S. 325 (1985); *see also Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1207 (10th Cir. 2003) ("physical examinations performed by [school personnel] constituted 'searches' within the meaning of the Fourth Amendment").  Further, it is also well established that some sort of constitutional protections derived from **Substantive Due Process** (discussed below) protect students from extreme forms of corporal punishment in the school setting. *See, e.g.*, *Garcia by Garcia v. Miera*, 817 F.2d 650 (10th Cir. 1987).

At the same time, the Tenth Circuit has never found a viable Fourth Amendment claim based on a school discipline fact pattern, though it has rejected several such claims.  In rejecting these claims, it has adhered to a three-prong test.  That test was articulated in *Couture v. Board of Education of Albuquerque Public School*, 535 F.3d 1243 (10th Cir. 2008), which involved a Fourth Amendment claim related to school personnel's decision to place an aggressive and often violent special-needs child into a time-out room for extensive periods of time during the school day.

The *Couture* test requires this Court to consider three questions: (1) whether the student was "seized," for Fourth Amendment purposes, which in the school context means that "the limitation on the student's freedom of movement must significantly exceed that inherent in every-day, compulsory attendance," *id.* at 1251; (2) whether the seizure was "justified at its inception," *id.* at 1250; and (3) whether the seizure was "reasonably related in scope to the circumstances which justified the interference in the first place," *id.*  *Couture* found no Fourth Amendment violation in the school personnel's conduct because, on the second and third prongs of the test, the timeouts were justified and reasonable in scope, in light of the legitimate school safety and disciplinary concerns raised by the child's violent behavioral problems.  *Id.* at 1251-56

While *Couture* provides this straightforward test, more recent Tenth Circuit authority—published after the incidents giving rise to this case—calls into question whether the Fourth Amendment even **applies** in the school discipline context.  In particular, in *Muskrat v. Deer Creek Public Schools*, 715 F.3d 775 (10th Cir. 2013), the Tenth Circuit stated that "it is not settled law that the Fourth Amendment applies in school discipline cases" and "it is not settled law that the district court had an

obligation to evaluate the [*Muskrat* plaintiffs'] case under the Fourth Amendment." *Id.* at 792.  Instead, the *Muskrat* court seemed to suggest that school discipline claims should be viewed **only** under the Due Process Clause's "shocks the conscience" test (discussed below). *Id.*

As support for this position, *Muskrat* stated that although other circuits had considered the Fourth Amendment test in school discipline cases, the Tenth Circuit had considered it in only one case: *Couture.*  The *Muskrat* court further emphasized that when *Couture* rejected the Fourth Amendment claim, it "gave no indication whether the district court correctly determined that the Fourth Amendment, rather than the Fourteenth, provided the appropriate constitutional protection." *Id.* at 791.

For a number of reasons, these statements about *Couture* in *Muskrat* are puzzling.  First, contrary to *Muskrat*'s claim that *Couture* "gave no indication" that the Fourth Amendment applies to school discipline cases, *Couture* gave plenty of such indication.  For example, *Couture* explicitly stated that "the [Fourth] Amendment **is now understood to apply** within the school setting, and it is not limited to actions taken for law enforcement purposes." *Id.* at 1250 (10th Cir. 2008) (*T.L.O.*, 469 U.S. 325) (emphasis added).

Second, *Couture* adopted a framework derived from an earlier Fourth Amendment school case, *Edwards v. Rees,* 883 F.2d 882, 884 (10th Cir. 1989), which also adopted no limiting principle on the Amendment's application to different types of school seizures.  *Edwards* concerned a principal's decision to interrogate a student for twenty minutes behind a closed door about a bomb threat that was called in on the school building.  The principal in *Edwards* thought the student made the call and

allegedly "threatened the student with felony prosecution, and questioned him in an intimidating and coercive manner." *Id.* at 883. *Edwards* discusses the limits "the Constitution places on the **investigative and disciplinary** activities of school authorities," *id.* at 883-84, and seems to couch its analysis into the reasonableness of the **investigation** that the principal took in investigating the bomb threat. But unlike *Muskrat*, *Edwards* never suggests that there is a distinction between the Fourth Amendment analysis for investigations and disciplinary actions. Further, *Couture* derives the last two prongs of the above test from language in *Edwards*. Yet *Couture*, like *Edwards*, draws no distinction between seizures for investigative and disciplinary purposes. Rather, *Couture* unreservedly applied the three-part Fourth-Amendment test derived partially from *Edwards*.

Third, *Couture* cites favorably to an earlier Seventh Circuit case, *Wallace v. Batavia School District 101,* 68 F.3d 1010 (7th Cir. 1995), which considered a Fourth Amendment claim from a student whose teacher grabbed her wrist in order to prevent her from starting a fight with another student. *Wallace* squarely considered whether the scope of the Fourth Amendment should not extend to school discipline cases but should be limited to instances in which "school officials act in conjunction with law enforcement agents with the purpose of enforcing the law." *Id.* at 1013. But *Wallace* rejected that position as inconsistent with prior Supreme Court precedent on the Fourth Amendment's application to schools. *Id.* (citing *T.L.O.*, 469 U.S. 325). Thus, *Wallace* presented a *Muskrat*-like argument for a limitation on the scope of Fourth Amendment protections available for school discipline cases but one which was embraced by neither the Seventh Circuit nor *Couture*.

Fourth, *Muskrat* is wrong that *Couture* was the only time the Tenth Circuit considered a school discipline question under a Fourth Amendment rubric.  To the contrary, eight months **before** *Muskrat* was decided, the Tenth Circuit considered a Fourth Amendment claim in *Ebonie S. v. Pueblo School District 60*, 695 F.3d 1051 (10th Cir. 2012), *cert. denied*, 133 S. Ct. 1583 (2013), which concerned a restrictive device on a desk that was used in part "to discipline" a special-needs child.  *Id.* at 1055.

*Muskrat* does not cite *Ebonie S.*, yet the latter case seems difficult to describe as anything but a school discipline case.  Further, applying the framework outlined in *Couture*, *Ebonie S.* considered (but rejected on the merits) a Fourth Amendment claim on the first ground outlined in *Couture*: the *Ebonie S.* court determined that the desk was not restrictive enough to constitute a seizure pursuant to the Fourth Amendment.  Finally, similar to *Couture*, *Ebonie S.* raised no suggestion as to the **inapplicability** of the framework used to assess the claim—it just applied the test.

In sum, if *Couture* itself did not give enough indication about the viability of Fourth Amendment claims in the school-discipline context, then *Ebonie S.* creates a pattern of silent acquiescence to considering such claims that is left unacknowledged in *Muskrat*.  Further, it is difficult to square the analysis of these two cases with *Muskrat*'s claim that the law regarding the applicability of the Fourth Amendment to school discipline cases is "unsettled."

To be sure, *Muskrat* could provide a silver bullet to many state actors seeking to avoid this Fourth Amendment theory of constitutional liability.  Indeed, even if *Muskrat* relied on arguably faulty premises to say that the Fourth Amendment law is "not settled," the statement itself seems to keep the question open to debate and, therefore, makes

such claims not "clearly established" for purposes of qualified immunity—at least as of April 2013, when *Muskrat* was decided.  But hiding behind the clearly established prong of the qualified immunity test, while technically permissible, is inadvisable, as it stifles the articulation of important constitutional norms.  *Cf. Plumhoff*, 134 S. Ct. at 2020 (noting that evaluating both prongs of the qualified immunity test "is often beneficial because it promotes the development of constitutional precedent" (internal quotation marks omitted)).

If the Tenth Circuit thinks the Fourth Amendment **does not** apply to school discipline cases, it should say so unequivocally and save litigants and district courts all the extra work of evaluating, litigating, and bringing such claims.  Fact patterns similar to the instant one occur with relative frequency in this circuit and around the country,[7] and if the easier-to-meet Fourth-Amendment reasonableness test—as opposed to the "shocks the conscience" test—really applies, it will often be outcome determinative as to a finding of a constitutional violation.  This Court implores the Tenth Circuit to give clearer reasoning on this question, especially in light of confusing language from *Muskrat*.

---

[7] *See, e.g.*, *Gonzales v. Passino,* 222 F. Supp.2d 1277, 1279–81 (D.N.M. 2002) (pre-*Couture* case suggesting that (at least at that time) some cases apply a Fourth Amendment analysis to instances of school discipline but concluding that the "clear weight of authority" indicates that the Fourteenth Amendment is the only one that applies); *Holloman v. Unified Sch. Dist. 259*, No. 05-1180-JTM, 2006 WL 1675932 (D. Kan. June 15, 2006) (another pre-*Couture* case expressing similar uncertainty about the applicability of the Fourth Amendment in this context); *see also* Diane Heckman, *Fourteenth Amendment Substantive Due Process and Academic Corporal Punishment in the First Decade of the Twenty-First Century*, 271 Ed. Law. Rep. 509, 2011 WL 5408930 (Nov. 10, 2011) (providing a good nationwide survey of the law in this area and documenting the developing split of authority on the applicability of the Fourth Amendment to school discipline cases); *C.B. v. City of Sonora*, 730 F.3d 816, 829 (9th Cir. 2013) (McKeown, J., concurring in part and dissenting in part) (one of many authorities that cites prior Tenth-Circuit authority in support of the proposition that the Fourth Amendment broadly applies to all school seizures), *reh'g en banc granted*, 755 F.3d 1043 (9th Cir. 2014).

All that being said, despite being cited extensively by the parties, neither *Ebonie S.* nor *Muskrat* is directly useful for evaluating the instant claim. Both of these cases **post-date** the events giving rise to this case, and for purposes of the qualified immunity question, cannot constitute "existing precedent," *Plumhoff*, 134 S. Ct. at 2023, that establishes the state of the law at the time of the alleged constitutional violations. Thus, in evaluating C.S.'s Fourth Amendment claims, this Court is limited to the two Tenth Circuit authorities discussed above: *Edwards* and *Couture.*

        b)    Application

Considering the framework and facts of *Edwards* and *Couture*, this Court now assesses C.S.'s three Fourth Amendment claims. The first two fail on the first prong of the qualified immunity test. The final one fails on the second prong.

First, C.S.'s first two alleged instances of Fourth Amendment violations—his isolation in class and in a school hallway—fail under the first prong of the *Couture* test because they do not constitute seizures, even assuming they were done with punitive (or even malicious intent). Getting sent out of class and being placed in a desk separated from the class are common disciplinary procedures used in school and neither "significantly exceed[s]" the restrictions on a student's freedoms that are inherent in a student's life. C.S. suggests that the isolation behind the desk was more highly restrictive in light of his cognitive abilities and apparent difficulty in getting out of a desk without assistance, but he has failed to provide any evidence that he could not leave the desk area by crawling, an action which he could indisputably perform.

Further, at a more practical level, if C.S. is unable to move out of any location he is placed in, and this constitutes a seizure under the Fourth Amendment, then his

teachers commit a constitutional tort every time he can **allege** he is placed in a particular environment with no justification.  This cannot be the state of the law—and this Court is not about to subject such frequently-occurring actions taken by teachers to an analysis under the Fourth Amendment.  *Cf. Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 273 (1988) ("[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local officials, and not federal judges.").

The third alleged constitutional violation—the head-pinning incident—presents a closer call.  If, as alleged, Ms. Stout pinned C.S.'s head to a desk for two minutes while reprimanding him, this does present a limitation on his freedom that "significantly exceed[s]" compulsory school attendance.  This action was also not justified at its inception, if the seizure was essentially because Ms. Stout did not like a response she received from C.S.  Finally, just as there was no justification at the inception of the seizure, it is questionable whether the alleged time was reasonable in scope: two minutes is a long time to have your head pinned to a table while an adult yells at you for no good reason.  *Cf. Doe ex rel. Doe v. Hawaii Dep't of Educ.*, 334 F.3d 906 (9th Cir. 2003) (applying a similar Fourth Amendment framework to the one adopted in *Couture* and concluding that when a principal taped a student's head to a tree for five minutes as discipline for fighting, this constituted a Fourth Amendment violation).

Yet even if this Court concludes that the unjustified and excessive physical contact with C.S. states a Fourth Amendment claim under *Couture*, C.S. presents no fact pattern of sufficient similarity to establish that the right was clearly established at the time of the incident in the Tenth Circuit.  To the contrary, the only two cases that

make up the relevant universe of clearly established precedent in the Tenth Circuit—

*Couture* and *Edwards*—detentions and presumed seizures of students that lasted a

much longer duration and constituted much greater intrusions on the student's liberty

were not found to rise to the level of constitutional violation.  *See Couture*, 535 F.3d

1243 (hours-long detention of student in timeout room was justified as reasonably

related to the need to isolate the indisputably unruly from his peers); *Edwards*, 883 F.2d

882 (twenty-minute interrogation of student reasonable).

To be sure, Plaintiff can allege that it is disputed whether the intervention here

was at all justified, which distinguishes his case from both of the prior precedents.

Nevertheless, in the absence of binding precedent finding a Fourth Amendment

violation for an unjustified seizure of two-minute duration, this Court cannot find that the

Fourth Amendment right's "contours were sufficiently definite that any reasonable

official in the defendant's shoes would have understood that he was violating it."

*Plumhoff*, 134 S. Ct. at 2023.

Simply put, C.S. is advancing a relatively novel theory of liability for a

constitutional tort, around which there is no consensus among the Courts of Appeal

and limited discussion in the Tenth Circuit.  The question is not closed to debate.  C.S.

therefore faces a heady—and in this case, insurmountable—challenge in overcoming

the second prong of the qualified immunity test.

2.     Substantive Due Process Claim

Next, C.S. alleges two acts give rise to substantive due process violations:

(1) Ms. Stout's abuse of the tilting technique (including the instances where she made

him crawl); and (2) the head-pinning episode.  Importantly, he alleges these incidents

led to his PTSD, though there are no documented physical injuries.

           a)    Standard

      To determine whether there is a violation of substantive due process, this Court

must consider "whether the force applied caused injury so severe, was so

disproportionate to the need presented, and was so inspired by malice or sadism rather

than a merely careless or unwise excess of zeal that it amounted to a brutal and

inhumane abuse of official power literally shocking to the conscience."  *Garcia by Garcia*

*v. Miera*, 817 F.2d 650, 655 (10th Cir. 1987) (quoting *Hall v. Tawney,* 621 F.2d 607, 613

(4th Cir.1980)).

      This so-called "shocks the conscience" standard is difficult to meet, as C.S. must

demonstrate "a degree of outrageousness and a magnitude of potential or actual harm

that is truly conscience shocking."  *Uhlrig v. Harder,* 64 F.3d 567, 574 (10th Cir.1995).

*See, e.g., Garcia,* 817 F.2d at 652-53 (finding a substantive due process violation where

a principal paddled a nine-year-old girl while holding her upside down, bloodied the girl's

clothing, and left a permanent scar); *Gerks v. Deathe*, 832 F. Supp. 1450 (W.D. Okla.

1993) ("shocks the conscience" standard met where a teacher locked a mentally-

handicapped child in a bathroom for two hours and made her clean up excrement on

the floor, even though the child had a known fear of being alone in a bathroom); *Nicol*

*v. Auburn-Washburn USD 437*, 231 F. Supp. 2d 1092 (D. Kan. 2002) (shocks-the-

conscience test met (for purposes of motion to dismiss) where school security officer

allegedly grabbed plaintiff by the throat, cutting off her air supply; threw her into a wall;

slammed her into a drinking fountain; and ripped her away from the drinking fountain with such force that the drinking fountain came out of the wall).

Many acts that are rightly condemned as deeply misguided still fail to pass the "shock the conscience" test.  *See, e.g.*, *Harris v. Robinson*, 273 F.3d 927 (10th Cir. 2001) (requiring student to unclog toilet with bare hands does not shock the conscience); *Abeyta v. Chama Valley Indep. Sch. Dist.*, 77 F.3d 1253 (10th Cir. 1996) (calling twelve-year-old girl a prostitute repeatedly in front of her friends does not shock judicial conscience).

Further, in the school setting, most unprovoked acts of violence that are short in duration and leave no physical injuries fail the "shock the conscience" test.  *See, e.g.*, *Gonzales v. Passino,* 222 F. Supp. 2d 1277 (D.N.M. 2002) (conduct of teacher who intentionally pushed and hit a student, causing tenderness, bruising, and swelling, was not conscience-shocking); *see also Smith ex rel. Smith v. Half Hollow Hills Central School District*, 298 F.3d 168 (2d Cir. 2002) ("Striking a student without any pedagogical or disciplinary justification . . . is undeniably wrong. . . . However, not all wrongs perpetrated by a government actor violate due process."); *Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.*, 272 F.3d 168 (3d Cir. 2001) (principal's unprovoked shove of a student, which left the student with some alleged back pain, did not constitute a substantive due process violation); *cf. Muskrat*, 715 F.3d 786-87 (case that post-dates incidents here which establishes that restraining and "popping" student on the cheek does not shock the judicial conscience).

b)    Application

C.S. cannot meet the demanding standard for establishing a substantive due process violation.  To be sure, he alleges actions—such as being dumped from a chair on pretext of being "tilted" out of the chair, being forced to crawl in a humiliating manner, and having his head pinned to a desk—which are condemnable.  At the same time, this Court cannot find that the force Ms. Stout allegedly applied could have caused a "severe" injury and was "inspired by malice or sadism rather than a merely careless or unwise excess of zeal."  Interpreting the facts in the light most favorable to Plaintiff, C.S. was the victim of unprovoked attacks by Ms. Stout that lasted a short duration and left no permanent physical injuries.  Under the law of this circuit, that is insufficient to establish a violation of substantive due process.

Further, even if this claim rises to the level of constitutional tort, it was not clearly established in 2010.  Indeed, C.S. mainly relies on cases that at a high level of generality are similar to his, without citing any cases that present similar factual scenarios to his: namely, cases with unprovoked acts of violence that leave no real physical injuries—only psychological ones.[8]

---

[8]  C.S. relies on several (out-of-circuit) cases he thinks are similar to his case, but they all present markedly worse factual scenarios than what is alleged to have happened here. *See Preschooler II v. Clark Cnty. Sch. Bd. of Trustees*, 479 F.3d 1175, 1178 (9th Cir. 2007) (defendant repeatedly slapped a four-year-old student in the face and body slammed student into a chair, which left the student with noticeable scratches and bruises); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 249 (2d Cir. 2001) (teacher slammed student into bleachers and metal fuse box repeatedly and punched student in the face); *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987) (defendant rammed his shoulder a few times against a door until it gave way and plaintiff was knocked to the floor on the other side of door; then the defendant grabbed her, threw her against the wall, and slapped her).

Thus, while Plaintiff's allegations here might sustain a claim under state tort law (see below), they are not appropriately characterized as substantive violations of the Due Process Clause. *Cf. Daniels v. Williams*, 474 U.S. 327, 332 (1986) ("[T]he Fourteenth Amendment [is not] a font of tort law to be superimposed upon whatever systems may already be administered by the States[.]" (internal quotation marks omitted)).

3.    Procedural Due Process Claim

Next, C.S. alleges that Ms. Stout violated C.S's right to Procedural Due Process when she—without notice—removed him from class, isolated him from the rest of the class, dumped him from his chair, and forced his head to his desk.

In support of this theory, C.S. likens his case to *Goss v. Lopez*, 419 U.S. 565 (1975). In *Goss*, "the Supreme Court declared that public school students have a protected property interest in public education and a liberty interest in their reputations, and therefore are entitled to certain procedural due process protections within the educational context." *Couture*, 535 F.3d at 1257 (citing *Goss*). Further, the *Goss* Court held that "[w]hen complete deprivation of education occurs, such as when a student is removed from the school for a lengthy time period, . . . the student at minimum is entitled to 'notice and . . . some kind of hearing,' though the 'timing and content of the notice and the nature of the hearing will depend on the appropriate accommodation of competing interests involved.'" *Id.* (quoting *Goss*, 419 U.S. at 578-79).

In *Couture*, discussed above, the Tenth Circuit addressed whether a total of twenty-one extended timeouts—totaling about twelve hours of class and occurring over an approximately two-and-a-half month period—satisfied the *Goss* standard for a

complete deprivation of education triggering Procedural Due Process protections. *Couture*, 535 F.3d at 1257.  The Court determined that this loss "is incomparable to missing ten straight days of instruction," *id.* at 1257, and recognized that the timeouts could not be converted into a constitutional claim unless they "rise to the level of the functional equivalent of a lengthy in-school suspension," *id.* at 1258.

C.S. does not acknowledge this analysis from *Couture*, though it presents a clear impediment to recognizing a violation of his right to procedural due process.  *Couture* establishes that no hearing is required for a school district to institute twenty-one time-outs over a period of several months.  Plaintiff may be slightly above this number of mandated absences from class—he appears to allege several time-outs per week, without specifying a precise number—but this Court sees no case that establishes, notwithstanding Couture, that this slightly higher number rises to the level of a due process violation.

    4.   Equal Protection Claim

C.S.'s last constitutional claim against Ms. Stout is a "class-of-one" claim based on the Equal Protection Clause of the Fourteenth Amendment.  This claim is premised on the fact that C.S., as a class onto himself, was intentionally and arbitrarily singled out for worse treatment than the other students in his class.  As support for this theory C.S. relies on *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curium), which concerned a class-of-one claim that alleged irrational discrimination based on the fact that one property owner had been required to grant a 33-foot easement as a condition of receiving a service, even though every other similarly situated property owner was required to grant only a 15-foot easement.

The *Olech* Court recognized the property owner's claim as a legally cognizable Equal Protection violation.  First, the *Olech* Court reasoned that an Equal Protection violation can lie "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Id.* at 564.  Second, applying rational basis review in this case, the Court found that the plaintiff had at least sufficiently pleaded an Equal Protection claim by alleging that it was "irrational and wholly arbitrary" to require the plaintiff to provide 33 feet when everyone else got away with 15 feet.  *Id.*

C.S. argues that his case is on all fours with *Olech* in that he was irrationally targeted by Ms. Stout for various forms of punishment, just as the plaintiff in *Olech* was irrationally targeted by the state and asked to provide a greater easement.  What C.S. fails to note, however, is that a later Supreme Court case, *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008), which concerned class-of-one claims in the employment context, significantly limited that earlier case's scope.  In relevant part, *Enquist* dictates:

> there are some forms of state action, . . . which by their nature involve discretionary decision making based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. **In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise**.

*Id.* at 603 (emphasis added).  Echoing this principle, *Engquist* also distinguishes between the very measurable form of discrimination at issue in *Olech*—the 15- v. 33-foot easement—from what is present in the employment context, where there are not as

concrete of metrics to measure potential discrimination.  *Id.* at 602-03.  While *Engquist* in no way undermines class-of-one Equal Protection Claims brought on the basis of race or sex, *id.* at 603-04, it is undisputable that it places a limit on class-of-one claims brought on the basis of claims—such as the instant one—which are subject to only rational basis review.

Enquist is an insurmountable obstacle to C.S.'s Equal Protection claim.  First, *Enquist* strongly suggests that class-of-one Equal Protection Claims subject to rational basis review do not apply in the school discipline context because interpreting the import of such actions turns on assessing the discretionary actions of the teacher. Indeed, allowing such a claim "based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." *Engquist*, 553 U.S. at 603.  In short, being singled out for school punishment because the teacher has it in for you is wrong, but for the reasons outlined in *Engquist*, addressing this wrong should be channeled to remedies other than the Equal Protection Clause.

Second, even if there were a way around *Engquist*—and C.S. suggests none, as he fails to even acknowledge this binding precedent—the claim fails on the second prong of the qualified immunity test.  As an initial matter, C.S. cites no cases that have endorsed class-of-one theories in the school discipline context—and this Court has found none.  Rather, C.S. hangs his hat on *Olech* alone: but this case is similar to his only at a high level of generality and *Engquist* dictates that the scope of this is not "beyond debate," such that any violation was clearly established at the time of the incident.  *See also Jicarilla Apache Nation v. Rio Arriba Cty.*, 440 F.3d 1202, 1209 (10th

Cir. 2006) (noting that the Tenth Circuit has "proceeded cautiously in applying the [class-of-one] theory, sensitive to [the Supreme Court's] warning against turning even quotidian exercises of government discretion into constitutional causes").

    5.    <u>Supervisory and Entity Liability for Constitutional—Mr. Schmidt and PCSD</u>

C.S. also argues that there are theories of liability for constitutional torts that apply to both Mr. Schmidt and to PCSD.  Plaintiff's theory here is premised on the fact that Ms. Stout's behavior was so bad that only a deliberately indifferent person or entity could fail to acknowledge the constitutional violation and the need to adequately train and supervise Ms. Stout.

C.S. cites significant amounts of case law as to this claim, but he presents no evidence that prior to August 2011, Mr. Schmidt and PCSD were even aware that there was an issue with Ms. Stout—let alone an issue rising to the level of a constitutional violation, which, as explained above this Court has largely failed to find.  Absent any sort of evidence of **notice** of a problem with Ms. Stout's classroom behavior, this Court cannot conclude that either of these defendants was deficient—let alone deliberately indifferent—in training and supervising her.  *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767-771 (10th Cir. 2013) (holding that notice (constructive or actual) is an element of a *Monell* claim and that supervisory liability requires demonstrating a failure to act "when **presented** with an obvious risk of constitutional harm").[9]

---

[9]  C.S. also suggests that when the district concluded that "dumping" a student was standard practice in PCSD, they ratified an unconstitutional policy because "dumping" in itself is unconstitutional.  As noted above, the actual dumping technique requires "slowly tilting [C.S.'s] chair forward in a manner that [would] raise[] and move[] [C.S.'s] center of gravity forward over his feet" so he could stand.  (Doc. # 44-11 at 2.)  The Court is unwilling to find that properly

6.  Federal Statutory Claims

For similar reasons, this Court concludes Plaintiff's federal statutory claims

fail.  C.S. brings these claims under the Americans with Disabilities Act and the

Rehabilitation Act, both of which employ essentially the same standard for a finding of

a violation.  *Kimble v. Douglas Cnty. Sch. Dist. RE-1*, 925 F. Supp. 2d 1176, 1182-83

(D. Colo. 2013) (explaining this framework in greater detail).

Recovery of compensatory damages on these claims requires a showing that

PCSD intentionally discriminated against C.S.  *Id.*  As C.S. notes, "intentional

discrimination can be inferred from a defendant's deliberate indifference to the strong

likelihood that pursuit of its questioned policies will likely result in a violation of federally

protected rights."  *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir.

1999).  "The test for deliberate indifference in the context of intentional discrimination

comprises two prongs: (1) knowledge that a harm to a federally protected right is

substantially likely, and (2) a failure to act upon that . . . likelihood."  *Barber ex rel.*

*Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1229 (10th Cir. 2009) (internal

quotations omitted).

Just as C.S. cannot establish the deliberate indifference standard for his

constitutional tort theories, he cannot satisfy the test for a violation of these federal

statutes.  Again, C.S. presents no more than conclusory allegations that district officials

were on notice of Ms. Stout's allegedly improper conduct or that they had knowledge

about the substantial likelihood of harm befalling C.S.  The absence of any clear notice

conducted "dumping" or tilting constitutes a constitutional violation, even if Ms. Stout's
potentially abusive use of this technique might have been deeply misguided.

to supervisors prior to August 2011 of C.S.'s problems with Ms. Stout undermines this claim to liability.

## C.    STATE TORT CLAIMS

C.S. also raises a number of state-law tort claims.  In response, Defendants invoke state-law immunity doctrines limiting the applicability of the state tort law claims for actions committed by state actors.  In light of the fact that this Court has concluded that none of C.S.'s federal claims can proceed to trial, this Court dismisses the state-law claims without prejudice: principles of comity and federalism dictate that a Colorado court should decide these important matters in the first instance, especially as there are no federal claims upon which this Court's jurisdiction rests.[10]

## IV.  CONCLUSION

This Court GRANTS IN PART Defendant's Motion for Summary Judgment (Doc. # 44) and DISMISSES WITH PREJUDICE all of Plaintiff's federal claims.  It further DISMISSES WITHOUT PREJUDICE Plaintiff's state law claims.  It further affirms the Recommendation of Magistrate Judge Boland (Doc. # 60).

---

[10]  *Accord United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) ("[*Gibbs*] simply recognizes that in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").

FURTHER, this Court DENIES or OVERRULES:

1.      Defendants' Motion to Exclude (Doc. # 70) and Motion in Limine

(Doc. # 71);

2.      Defendants' Objections to the Recommendation (Doc. # 61); and

3.      Defendants' Motion to Dismiss (Doc. # 31).

IT IS FURTHER ORDERED that, in light of this order, the Final Trial Preparation

Conference and Jury Selection, set for October 14, 2014, and the seven-day Jury Trial,

set to commence October 20, 2014, are VACATED, and this case is DISMISSED.

DATED:  September 23, 2014

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge